# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### August 20, 2002 Session

## STATE OF TENNESSEE v. ROBERT F. SMYTHERS

**Direct Appeal from the Circuit Court for Monroe County**
**No. 98-202    R. Steven Bebb, Judge**

---

**No. E2001-02806-CCA-R3-CD**
**May 19, 2003**

---

The Defendant was indicted for first degree premeditated murder and a Monroe County jury convicted him of the lesser-included offense of second degree murder. The trial court sentenced him to twenty years' incarceration. In this appeal as of right, the Defendant argues (1) that he was denied his right to a speedy trial; (2) that the trial court erred by refusing to allow the defense to question police officers about the victim's reputation for violence; (3) that the trial court erred by excluding from evidence an audiotape of a pretrial statement by witness Casey Miller; and (4) that the trial court erred in instructing the jury regarding first degree murder and second degree murder. After a careful review of the jury instructions in this case, which fail to define "knowingly," we reverse the judgment of the trial court and remand for a new trial.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reversed**
**and Remanded**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which GARY R. WADE, P.J., joined. JAMES CURWOOD WITT, JR., J., not participating.

Charles G. Currier, Knoxville, Tennessee, for the appellant, Robert F. Smythers.

Paul G. Summers, Attorney General and Reporter; Mark A. Fulks, Assistant Attorney General; Jerry N. Estes, District Attorney General; William A. Reedy and Daniel Cole, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

On August 4, 1998, the Monroe County Grand Jury charged the Defendant, Robert F. Smythers, and his son, Robert J. Smythers, with the first degree premeditated murder of Robert C. Hill. Following a jury trial, conducted in March 1999, a Monroe County jury found the Defendant guilty of second degree murder, but acquitted his son. The trial court sentenced the Defendant as a violent offender to twenty years' incarceration. The Defendant now appeals his conviction, arguing: (1) that he was denied his right to a speedy trial; (2) that the trial court erred by refusing to

allow the defense to question police officers about the victim's reputation for violence; (3) that the trial court erred by excluding from evidence an audiotape of a pretrial statement by witness Casey Miller; and (4) that the trial court erred in instructing the jury regarding first degree murder and second degree murder. Because the jury instructions did not define "knowingly," which is an element of the offense of second degree murder and can be an element of voluntary manslaughter (which can be committed either intentionally or knowingly), we are required to reverse the judgment of the trial court and remand to the trial court for a new trial.

Detective James Shaw of the Monroe County Sheriff's Department testified that at 11:30 p.m. on June 20, 1998, he received a call informing him that there had been a stabbing at Jack's Tavern, a bar located a couple of miles outside of Madisonville. He stated that when he arrived at the scene, three other officers were already there. He recalled seeing the victim, who was already deceased, lying on the ground in bloody clothes, and he stated that several witnesses to the homicide were present at the scene. Shaw testified that he took photographs of the victim and identified him by his driver's license as Charles Hill. He also took photographs of Jack's Tavern, interviewed witnesses, and learned who owned the vehicles parked outside of the bar. He stated that he remained at the scene approximately thirty to forty minutes.

Shaw reported that he was instructed by the sheriff to find the Defendant and the Defendant's son. He stated that he learned from a witness at the scene that he might find the two men at a residence, a trailer, located approximately seven or eight miles from the bar which belonged to Eddie Miller, the cousin of the Defendant and his son. Shaw testified that he and other officers drove to the residence, where they saw a blue Ford pickup truck belonging to the Defendant. He stated that he knocked on the door of the trailer and spoke to the owner of the trailer for approximately fifteen minutes. Shaw stated that during this conversation, the Defendant was sitting on a love seat inside the trailer in view of the officers, but Shaw testified that he did not have a description of the Defendant and therefore did not recognize him as the suspect he had been instructed to find. He recalled that during the conversation, the Defendant got up, walked to the back of the trailer, later returned with his son, and said, "You are looking for us." The officers then placed both men under arrest, placed them in separate police vehicles, and read them their rights. Shaw stated that the Defendant requested a lawyer.

Shaw testified that the officers then transported the two men to the Monroe County Sheriff's Department. He stated that he and Agent Jordan took the Defendant's son to Shaw's office, again advised him of his rights, had him sign a waiver of rights form, and then interviewed him. Shaw reported that the Defendant's son told them that he and his father had been at a bar and had left in a blue Ford pickup truck. The Defendant's son denied knowing anything about an altercation that had taken place at the bar. Shaw stated that the Defendant's son became "a little agitated and upset" while being questioned. He recalled, however, that on the night of the arrests, both the Defendant and his son were otherwise quiet and cooperative.

Shaw then identified a photograph of the Defendant's son which he took on the night of the arrests. He also identified a photograph of the Defendant which he took on the night of the incident

approximately two hours after he was called to the scene. Shaw stated that he saw no marks, abrasions, cuts or any type of injuries on either man. In addition, Shaw introduced into evidence several articles of clothing collected following the incident: the Defendant's clothes and shoes, the Defendant's son's tennis shoes, and the victim's pants and shoes. Finally, Shaw testified that although he had searched for a murder weapon, no such weapon was ever recovered. He also reported that no weapon was found on the victim's person.

On cross-examination, Shaw testified that the victim was approximately six feet tall and weighed over 200 pounds. He stated that the victim was probably larger than either the Defendant or the Defendant's son.

Agent T.J. Jordan of the Tennessee Bureau of Investigation testified that he responded to the scene on the night of the crime and that he later interviewed the Defendant's son at the Monroe County Sheriff's Department following his arrest. Jordan stated that during the interview, the Defendant's son told him and Shaw that he had been at Jack's Tavern, "[that he] had been drinking, [that he] was with his father, [that he] had not been in any altercations and [that he] left in . . . a blue Ford pickup truck, and he didn't know nothing about nothing." He recalled that the Defendant's son "was belligerent . . . [and] acted ugly" during the interview. Jordan stated that he had the Defendant's son's shoes removed because he saw what appeared to blood on the shoes, and he stated that he directed correctional officers to collect the clothes that the Defendant and his son were wearing. Jordan testified that he did not view any marks indicating trauma on either the Defendant or his son on the night of their arrests, and he reported that neither man complained of any injuries.

On cross-examination, Jordan testified that a blood test performed on the Defendant's son on the night of his arrest revealed a blood alcohol level of 0.08 percent. In addition, he stated that he performed an itemized inventory of the items on the victim's person. He reported that the victim's wallet was essentially empty and that a small package containing what he presumed was marijuana was found on the victim's person.

Dr. Ron Toolsie, the Bradley County Medical Examiner, testified that on June 21, 1998, he performed an autopsy on the victim in this case. He estimated that the victim was approximately five feet, ten inches tall and weighed approximately 170 pounds. Toolsie reported that the victim had sustained twelve knife wounds, all of which appeared to have been inflicted by the same weapon, a single-edged knife with a sharp point and a blade approximately three millimeters thick. He specified that two of the fatal wounds were sustained in the chest and penetrated the heart; he reported that these wounds would have caused death in minutes. He stated that a third wound was found in the chest area which did not penetrate the thoracic cavity. Toolsie described the fourth knife wound as a "tiny puncture mark" that did not penetrate the chest. A fifth wound penetrated the chest and entered the chest cavity, but did not "produce any laceration of any of the internal thoracic organs." Regarding the remaining wounds, Toolsie testified that two of the wounds penetrated the victim's abdominal wall, but did not result in lacerations to any of the major internal abdominal organs. He reported that two other wounds were defensive wounds found on the victim's upper left forearm and his left leg. Another wound was found on the side wall of the chest, and a

wound located in the upper portion of the left back penetrated the thoracic cavity. The final wound was a wound found just above the victim's hip. Toolsie testified that all of the stab wounds would have "produce[d] some sort of reflect defense activity" by the victim. Toolsie further testified that the person who stabbed the victim was "[a]lmost certainly right-handed" or at least was holding the knife in his or her right hand.

Toolsie reported that the victim had also sustained several fairly minor contusions, abrasions, and scratches. He specified that the victim had a "pinch abrasion" on his right shoulder that was "almost certainly a result of the garments being grabbed and pulled with enough force to actually cause an abrasion of the skin and tissues underneath that." He reported that in addition, the victim sustained an abrasion underneath his right eyebrow; some bruising around his right eye, probably as a result of blunt force trauma; a bruise over his left cheek bone; and a small scratch beneath his left cheekbone. He stated that these injuries were "all very recent" and opined that they were sustained at the same time as the knife wounds. Toolsie further testified that the victim had sustained "gliding abrasions" on two fingers of his right hand, and he explained that because the abrasions were rectangular in shape, they were probably caused by a flat object, rather than a curved or sharp object. He stated that contact with the ground could cause such an abrasion, but that the abrasions were not "the classical sort of injury for a clinched fist striking a face." Upon further questioning, he testified that if the abrasions had been caused by striking another person's face, he would expect for the other person's face to show some trauma. Toolsie stated that the wounds were "consistent with a fight," and he concluded that they were all inflicted around the same time.

On cross-examination, Toolsie stated that the victim was "a muscular individual." He also stated that the Defendant's son was of a much slighter build than the victim. Toolsie further testified that the victim's "statu[r]e was more robust" than that of the Defendant and that the victim had " a bit more muscular build" than the Defendant. Finally, Toolsie testified with regard to the stab wound in the victim's back that he could not "state with any conviction that [the victim] was stabbed from behind." He explained, "[T]he assailants may well have been in front of the victim and as the victim slumped over then he sustained a stab wound to the back."

Vickie Cansler, the victim's sister, testified that her brother was thirty-three years old at the time of his death. She stated that he was married and had a step-daughter who was seven at the time of trial. She reported that her brother was a truck driver. Cansler recalled that she last saw her brother on the day he died. She testified that on that day, they and other family members helped their aunt move from approximately 10:00 a.m. until 4:30 p.m. According to Cansler, the victim drank six beers during this period, but did not appear to be intoxicated when he left. Cansler testified that after helping his aunt move, the victim was planning to buy a dress for his daughter to wear to church the following morning.

Danny Lee, who was employed as a mason, testified that on June 20, 1998, he went to Jack's Tavern for the first time with two friends to shoot a game of pool. He stated that prior to that evening, he did not know or know of the victim, the Defendant, or the Defendant's son. Lee recalled that while he was playing pool, he noticed that the men next to him, who were also playing pool,

were betting $1.50 or $2.00 per game.  He identified one of the two men as the victim and said that he "assume[d]" the other man was the Defendant's son, although he admitted that he was not certain that the Defendant's son was the person he saw playing pool with the victim.  Lee testified that the Defendant was "sitting there watching" his son and the victim play pool.

Lee stated that the victim won a game and asked for his money.  He reported that the Defendant's son, however, refused to pay the victim, and the victim told him, "Well, we can take it outside."  He recalled that the two men then left the bar, and when he followed, he saw them fighting outside.  Lee testified that the victim "was probably holding his own pretty good" until the Defendant began to engage in the fight.  He described the altercation as "a regular fight" with the participants "scrapping, punching back and forth, [and] holding on."  He reported that while the son and the victim "kind of hooked up together," the Defendant started punching the victim in the face and chest.  He also recalled seeing the Defendant inflict "'a side punch or a round side punch'" on the victim.

Lee testified that the victim continued to fight for a minute or two and then said "he had enough."  He stated that he believed someone then "came up to kind of like split them up" and walked the victim over to a car.  Lee testified that he initially saw only a small amount of blood on the victim, but stated that when the victim was placed in the car, he could see that the victim was bleeding badly and could not sit up.  He also recalled seeing someone attempt to perform cardiopulmonary resuscitation (CPR) on the victim.  Lee testified that he then left the vicinity with his two friends because he "didn't want to be involved."

Lee stated that when a detective tried to contact him after the homicide, he called his lawyer, who advised him to contact the prosecutor in this case.  He testified that he did so within the weeks prior to trial.  Lee admitted that a criminal case was pending against him.  He also admitted that he was reluctant to become involved in this case because he was concerned that his involvement would affect his pending criminal case.

Lloyd Russell, a resident of Loudon County, testified that prior to June 20, 1998, he had met the Defendant and his son, and he stated that he had seen them several times between approximately 1993 or 1994 and that date.  He stated that he had known the victim for ten or fifteen years.  Russell testified that on the evening of the homicide, he went to Jack's Tavern.  He explained that he worked as a mechanic and was to meet someone at the bar whose truck he was repairing.  He recalled that he arrived at Jack's at approximately 9:30 p.m. and left at 11:30 p.m., immediately after the incident.  He stated that he drank possibly two beers while he was there.

Russell testified that while he was at the bar, an argument "broke out" at one of the pool tables, but he did not initially pay attention to it because he was talking to Jack Gunter, the owner of Jack's Tavern, at the bar.  He stated that the altercation was between the victim and the Defendant's son, who were arguing about a pool game.  Russell stated that the victim soon walked to the bar, began to talk to Gunter, and then asked Russell to accompany him to Sassy's, a club in Sweetwater.  Russell declined the offer, and the victim then put his cue stick up and began to walk

towards the door. Russell recalled that at this point, he again heard the victim and the Defendant's son arguing. He stated that he heard the victim tell the Defendant's son, "If you want your ass whipped over a dollar and a half step outside." According to Russell, the Defendant's son "flipped [the victim] 'a bird,'" and the victim "swung at him." He reported that he was unsure whether the victim actually hit the Defendant's son, but he noticed that the son's hat fell to the floor.

Russell reported that Gunter then ran to the door, where the two men were standing, and told them "to take it outside." Russell stated that he then saw the victim "back[] out the door," arguing, and the Defendant follow, stepping around Gunter. He testified that as this was happening, he walked to the restroom and stayed there for three or four minutes. He recalled that when he walked back into the bar, a young man and a young woman ran into the bar and said, "You need to call the ambulance, this guy is bleeding bad." Russell stated that he finished his beer at the bar, walked out to his car, and left. He noticed six or eight people standing outside around the cars parked in the parking lot when he left, but he did not notice the Defendant or the Defendant's son in the group of people.

On cross-examination, Russell admitted that he had been convicted in Georgia of possession of an explosive device and of possession of a firearm by a convicted felon, for which he had received an eight-year sentence. He also admitted that he had been convicted of burglary in Georgia, for which he had received a ten-year sentence. Russell further admitted that he had been convicted of the following crimes in Monroe County: possession of cocaine for resale, for which he was sentenced to seven years; and possession of marijuana for resale, for which he received a five-year sentence. In addition, Russell admitted that he was convicted in Loudon County of receiving and concealing stolen property valued over $300, for which he received a three-year probated sentence. Finally, Russell stated that he did remember discussing the fight at Jack's Tavern with Casey Miller, however, he maintained that he did not tell Casey Miller that he gave someone a knife.

Dewayne Lee Cook testified that he was twenty-five years old at the time of trial, and he testified that his nickname was "Catfish." He stated that prior to June 20, 1998, he did not know either the Defendant or his son, but he stated that he "knew of" the victim. Cook stated that he arrived at Jack's Tavern at approximately 11:30 p.m on June 20, 1998 to pick up some beer. He testified that he rode with three other people to the bar, who all stayed inside the car while he went inside. Cook recalled that as he pulled into the parking lot, he saw three men fighting on the hood of a car and several people standing around them. He said that he noticed that one of the men was the victim, who was fighting the other two men, so he walked over to them and said, "There won't be two on one." He then grabbed the "older guy" and "pulled him back" from the victim, who was lying on the hood of the car. Cook stated that when he did so, he noticed that the older man had what appeared to be a knife in his hand. Cook went into the bar and told Jack Gunter to call for help. He then bought his beer, walked back outside, and left. He noticed as he was leaving that the victim was lying on the ground, bloody and calling for help. Cook testified that he could not identify either of the two men he saw fighting the victim on the night of the victim's death.

Charles Gibson testified that he frequented Jack's Tavern and reported that he was at the bar on June 20, 1998. He stated that he was standing outside the bar beside his truck talking to friends when he saw three men coming out of the door of the bar fighting. He identified two of the men as the Defendant and his son, but stated that he did not know either man at the time. He also stated that he did not know the victim. Gibson recalled that the victim emerged backwards from the bar first. According to Gibson, the three men proceeded, still fighting, to the back of one of the cars in the parking lot for a few seconds and then came back around the car. Gibson stated that it appeared that the victim "acted like he was just trying to get the guys off of him," and he reported that he never saw the victim attack the Defendant. He stated that the victim appeared to be losing the fight. According to Gibson, the victim then got into a black Mustang parked in the parking lot, sat down, got back out of the car, and laid down on the ground. Gibson testified that the victim did not get back up, and the two other men went to their vehicle and left the scene. He stated that the entire fight spanned only a matter of minutes. Gibson testified that after the two men left, he and his friend went to the victim, and his friend attempted CPR on the victim. He stated that the victim was not conscious for long.

On cross-examination, Gibson admitted that he had been drinking on the night of the homicide and that he had a marijuana cigarette behind his ear at the scene. However, he denied smoking the marijuana that night, and he stated that he was arrested later that night at Jack's for possession of marijuana. Gibson testified that he did not see a knife during the altercation, but he stated that the fight seemed to be unfair because there were "two on" the victim.

Casey Miller testified that defense counsel visited her prior to trial. She testified that defense counsel and her cousin, who came to the restaurant where she worked, "pretty much pressured" her into allowing defense counsel to record their conversation. She stated that she had known Lloyd Russell for years. When asked whether Lloyd Russell had told her anything about the knife used in this case, she stated,

> I told [defense counsel] I could not be sure if Lloyd told me anything about this case. I told him I did not know for sure anything, that I had talked to so many people that I was not sure if it was Lloyd that told me, and I told him I could not testify under oath that I would know the truth.

When asked whether she told defense counsel that Russell "had handed 'em' a knife," she responded, "It might have been Lloyd. . . . I was not sure."

Stephen Bledsoe, a dump truck driver, testified that he had met the Defendant and the Defendant's son approximately five or six years prior to trial. He stated that they worked together at a body shop. He reported that at the time of the victim's death, the Defendant and the Defendant's son were his roommates. In addition, Bledsoe testified that he had known the victim since the victim was a teenager. Bledsoe reported that the victim was between five feet, eleven inches and six feet in height and weighed about 200 pounds. He described the victim as "pretty stout."

Bledsoe testified that on June 20, 1998, he saw the Defendant before the Defendant went to Jack's Tavern. He stated that the Defendant consumed a few alcoholic drinks before leaving their

home, but he reported that the Defendant did not appear to be drunk. Bledsoe maintained that the Defendant had never expressed any feelings about the victim "[o]ther than he liked him." Bledsoe also testified that the Defendant was "[a]n honest[,] truthful man," and he maintained that the Defendant's son "seem[ed] the same way."

Bledsoe testified that he went to Jack's Tavern later that evening. He arrived at the bar at approximately 9:30 p.m. and stayed there approximately an hour. He testified that he saw several people at the bar, but did not see Dewayne Lee Cook. Bledsoe recalled that while he was at Jack's, he spoke to the Defendant. He also spoke to the victim, whom he characterized as "a close friend." He stated that the victim was "just being his normal happy go-lucky self." Bledsoe testified that although the victim did not appear to be drunk, he "could tell [the victim] was drinking." He also testified that the victim "got a little rowdy from time to time if he was drinking." Bledsoe recalled that when he left the bar, the atmosphere seemed to be normal, and the victim and the Defendant's son were playing pool together.

Bledsoe recalled that later that evening, police officers visited his home and asked him if he knew where the Defendant and his son were. They also asked where Eddie Miller, Miller's mother, and Miller's sister lived. He stated that he told the officers where Miller's mother lived and that Miller "lived around there somewhere close."

The Defendant's son testified that he worked as a "paint and body man." He maintained that he did not murder the victim in this case. The Defendant's son testified that on the afternoon of the victim's death, he went to Jack's Tavern around 3:00 p.m. to play pool and eat lunch. He stated that he drank the whole time he was at Jack's and estimated that he consumed a twelve-pack of beer or more. He recalled that he and the victim, whom he did not know before that day, played pool together and that the victim won twice. The Defendant's son testified that after the second game, he sat down next to his father and began talking to him. He reported that at this time, it was dark outside, and it was near closing time.

The Defendant's son recalled that the victim approached the Defendant, said something to him, and then walked to the bar. He stated that he victim then walked towards him and asked him "where his money was." The son testified that he replied, "[W]hat money is that[?]" and the victim told him that they were playing pool for money. The Defendant's son claimed that they began to argue about whether they had been betting on their pool games, and he claimed that during the argument, the victim told him, "I will just take you outside and beat you to death." According to the Defendant's son, the Defendant, overhearing this remark, stood up and said, "Hey, there's not going to be no fights now." The Defendant's son maintained that the victim responded by shoving his father backwards. He stated that Jack Gunter then approached the group and stood in front of the victim. He maintained that the victim, however, "took a swing at [the Defendant's son] and missed." The son reported that the victim then hit him open-handed in the nose while Gunter was pushing the victim out the door backwards. The Defendant's son stated that his father began to help Gunter push the victim, and during this process, the victim hit his father. The son stated that he hit the victim after the victim hit his father.

-8-

At this point, according to the Defendant's son, he and the victim began to fight outside of the bar. The son claimed that the victim grabbed him around the neck and started to choke him while he was hitting the victim in the face. He stated that the victim ended up on top of him at one point, they both got up, and the victim began to choke him again. He reported that they then "stumbled into some cars," and he "got thrown around" before the two separated and walked away. The Defendant's son claimed that his father was not involved in the fight. He also maintained that he sustained some minor injuries during the fight, including scratches and bruises.

After the fight, the Defendant's son proceeded with his father to the home of their cousin, Eddie Miller. He stated that when they left Jack's Tavern, the victim was standing up and walking. The son maintained that he did not notice blood on the victim when they left. He also claimed that he did not use a knife on the victim and did not see any knives during the fight. The Defendant's son recalled that later that night, law enforcement personnel arrived at Miller's home. He stated that he was in the bathroom when they arrived, and his father came to get him. He testified that he and his father then "surrendered [them]selves to the police."

On cross-examination, the Defendant's son stated that he was twenty-six years old, and he reported that he had graduated from high school. He reported that in June of 1998, he and his father were living with Stephen Bledsoe. The Defendant's son stated that he and his father frequently met at Jack's Tavern to play pool and drink beer. He testified that he was an alcoholic, but stated that his father was not. He reported that the victim "had a buzz" while they were playing pool. He also stated that although he was not betting on the game of pool that he played with the victim, he usually bet $1.50 per game.

The Defendant's son further testified on cross-examination that he had lost weight since the victim's death and weighed 135 pounds at the time of trial. He stated that the victim "whupped" him. He maintained that the victim hit him more than once on his body and in the face, causing his nose to bleed. The Defendant's son further maintained that although the victim pinned him down on his back on cement and gravel, he sustained no abrasions or injuries on his back during the fight. He stated that he did not see a knife or any other kind of weapon in the victim's hands. He explained that when he was questioned by officers following the incident, he was "scared . . . and . . . wanted to talk to a lawyer" because the officers told him that he was being charged with first degree murder. However, he admitted that he did not tell the officers that he was merely defending himself. On redirect examination, he testified that after drinking so much on the night of the victim's death, his memory of what happened that night was not entirely clear.

The Defendant testified next and reported that he did "paint and body work for a living." He recalled that on the afternoon of June 20, 1998, he was at Stephen Bledsoe's home, where he lived at the time. He stated that Bledsoe's home was located about a quarter of a mile from Jack's Tavern. The Defendant testified that while at Bledsoe's home, he drank a screwdriver and later left at approximately 10:00 p.m. to pick up his son from Jack's. He admitted that although he did not have a driver's license, he drove to the bar. He recalled that when he arrived there, he noticed several people smoking marijuana in the parking lot whom he knew. The group included Charles Gibson.

-9-

He maintained that Dewayne Lee Cook and Danny Lee were never at the bar on the night of the victim's death.

The Defendant stated that he entered the bar, ordered a Zima, and sat down. He noticed when he arrived that Lloyd Russell was sitting at the bar and that his son was playing pool with the victim, whom he had previously met on one or two occasions. He stated that his son was "drunk," but he reported that he was not intoxicated himself. The Defendant recalled that Stephen Bledsoe, who arrived at the bar after him, asked the Defendant to go to Sassy's, but the Defendant declined. He testified that he then saw Bledsoe speaking to the victim, and Bledsoe told the Defendant that he was going home. The Defendant testified that the victim then approached him and asked if he wanted to go to Sassy's, but the Defendant again declined the offer.

The Defendant testified that the victim next walked to the bar and spoke with Gunter and Russell. According to the Defendant, the victim then approached the Defendant's son and told the son to pay him. The Defendant testified that his son said, "I don't owe you no money, we wasn't [sic] shooting for no money." The Defendant claimed that the victim responded by saying, "If you don't pay me I will beat you to death." He testified that he then stood up and told the victim "there wasn't going to be any fighting." However, according to the Defendant, the victim shoved him backwards. The Defendant recalled that Gunter approached them, stood between them, and tried to push the victim out of the door. The Defendant stated that the victim next swung at his son, knocking his son's cap off his head, and swung a second time, hitting his son in the face. The Defendant reported that he moved behind Gunter and began to help Gunter try to push the victim out of the door. He stated that the victim jumped backwards, forcing Gunter and the Defendant out of the door behind him.

Outside, according to the Defendant, the victim hit him, knocking him against the side of the building. Then, the Defendant's son emerged from the bar and began fist-fighting with the victim. The Defendant testified that while his son and the victim were fighting, he attempted to separate them, and when he did so, the victim "knocked [him] back" against a vehicle in the parking lot. He stated that as he was getting up, he saw the victim holding a knife in one hand and his son's throat with the other hand. He maintained that he took the knife from the victim and "stuck [the victim] two or three times" to force the victim to release his son. He stated that the victim released his son and then hit the Defendant again, knocking him back against a car. He reported that the victim next got on top of him, choking and hitting him, and he hit the victim two or three times.

The Defendant recalled that during this altercation, Jack Gunter was yelling"[s]top it" to the victim. He testified that eventually, Gunter managed to place himself between the Defendant and the victim and grabbed the victim, ending the fight. The Defendant reported that he and his son then got into their truck and left. He stated that when they left, the victim was standing and "walking around with Jack" in the parking lot.

The Defendant testified that he and his son then drove to their cousin's house. He stated that they did so because his cousin had a phone, and he wanted to "call and check on this and see what

the charges would be and get it straightened out." However, he admitted that he did not call anyone while at his cousin's house. He testified that approximately an hour after he and his son arrived there, law enforcement personnel arrived to arrest them. He stated that he retrieved his son from the bathroom and told his son that they should "surrender to [the officers]."

The Defendant maintained that during the fight, he "was scared for his son's life" because the victim had threatened to kill his son inside the bar. He stated that he did not intend to kill or mutilate the victim, and he reported that when he and his son left the bar, he did not know that the victim was mortally wounded or dead. He also maintained that he did not feel any hatred towards the victim and stated, "I regret this happened."

On cross-examination, the Defendant testified that he refused to take a breathalyzer test after his arrest because he wanted to speak to his attorney first. He stated that he was surprised that he had been charged with murder and had assumed that he would be charged only with assault because he had used a knife during the fight. He explained, "[I]f you get into a fight you usually get arrested for assault or whatever." He stated that he stabbed the victim only five or six times and did not know how the victim sustained the remaining stab wounds.

Following the Defendant's testimony, Jack Gunter was recalled to the stand on rebuttal. He stated that he did not hear the victim threaten to kill the Defendant's son. He also testified that he did not see the Defendant take a knife from the victim. He stated, "I didn't see no [sic] knives period."

Juanita Yates was also called on rebuttal. She stated that she was Jack Gunter's former wife. She testified that she was working as a bartender at Jack's on the night of the victim's death. She recalled hearing the victim and the Defendant's son arguing in the bar and stated that she told her husband, "You need to get over there." She reported that she saw her husband step between the Defendant, the Defendant's son, and the victim and then "put [the victim] out the door." She stated that she saw the Defendant "scurr[y] out" under Jack's arm, followed by the Defendant's son, while Jack attempted to block the door. She testified that "Catfish" later told her to "call the law," stating, "The boy has been cut real bad, Bobby."

## I. RIGHT TO A SPEEDY TRIAL

The Defendant first argues that he was denied his right to a speedy trial. He contends that "[t]he trial court granted the State a continuance of this case from the trial setting in the autumn of 1998 to the spring of 1999 which unfairly prejudiced the Defendant . . . ." He argues that the State moved for a continuance because it was unprepared for trial.

However, the Defendant has incorrectly asserted that the State requested a continuance. Rather, the record reflects that the trial court continued the case after the State moved the court to disqualify defense counsel on the basis of a conflict of interest from the joint representation of the Defendant and his son. On the first day of a two-day hearing, the trial court ruled that a conflict of

interest existed because defense counsel was to represent both the Defendant and his son at trial, and it informed the two Defendants that they were to hire separate attorneys. It stated that although the trial had been set for the following day, the case would be continued to allow for the change in representation. In doing so, it noted that both the State and the defense were prepared for trial at the time it made its ruling. However, on the second day of the two-day hearing, the day originally set for the first day of trial, the trial court reversed its previous ruling and ruled that the Defendant and his son should be allowed to proceed to trial with the same attorney representing both of them. The trial court then set the case for trial in November 1998, and also in March 1999, if the trials of previously set cases interfered with the November 1998 date.

Criminal defendants are statutorily and constitutionally entitled to a speedy trial. See U.S. Const. amend. VI; Tenn. Const. art. I, § 9; Tenn. Code Ann. § 40-14-101. The right to a speedy trial protects the accused from oppressive pretrial incarceration, anxiety and concern arising from unresolved criminal charges, and the possibility that the accused's defense will be impaired by fading memories and the loss of exculpatory evidence. See Doggett v. United States, 505 U.S. 647, 654 (1992); State v. Simmons, 54 S.W.3d 755, 758 (Tenn. 2001). "The right to a speedy trial attaches at the time of arrest or indictment, whichever comes first, and continues until the date of the trial." State v. Vickers, 985 S.W.2d 1, 5 (Tenn. Crim. App. 1997).

In determining whether a defendant's right to a speedy trial has been compromised, four factors must be weighed: the length of the delay, the reason for the delay, the defendant's assertion of his right to a speedy trial, and any prejudice to the defendant caused by the delay. Barker v. Wingo, 407 U.S. 514, 530 (1972); State v. Utley, 956 S.W.2d 489, 492 (Tenn. 1997); State v. Bishop, 493 S.W.2d 81, 83-84 (Tenn. 1973). "[P]rejudice [is] the single most important factor in the balancing test," State v. Baker, 614 S.W.2d 352, 356 (Tenn. 1981), and the most important issue concerning prejudice to the defendant is the impairment of the ability to prepare a defense. Id. However, it is not necessary for a court to consider these factors unless there has been "some delay which is presumptively prejudicial." Barker, 407 U.S. at 530; see also Doggett, 505 U.S. at 651-52. Such a delay must "approach one year" to trigger an analysis of the remaining factors, Utley, 956 S.W.2d at 494; see also Vickers, 985 S.W.2d at 5, although "the line of demarcation depends on the nature of the case." Utley, 956 S.W.2d at 494.

In reviewing the trial court's determination regarding whether a defendant's right to a speedy trial was violated, this Court should use an abuse of discretion standard of review. See State v. Jefferson, 938 S.W.2d 1, 14 (Tenn. Crim. App. 1996); State v. Joseph Hart, No. 02C01-9902-CC-00075, 1999 Tenn. Crim. App. LEXIS 940, at ** 9-10 (Tenn. Crim. App., Jackson, Sept. 20, 1999); State v. Roy Dale Wakefield, No. 01C01-9609-CR-00389, 1998 Tenn. Crim. App. LEXIS 94, at * 5 (Tenn. Crim. App., Nashville, Jan. 21, 1998). If a court concludes that a defendant was denied the right to a speedy trial, constitutional principles demand that the defendant's conviction be reversed and that the criminal charges be dismissed. See State v. Bishop, 493 S.W.2d 81, 83 (Tenn. 1973).

In this case, the Defendant was arrested on the night of the homicide, June 20, 1998, and he was indicted for the crime on August 4, 1998. Thus, his right to a speedy trial attached on June 20, 1998. See Vickers, 985 S.W.2d at 5. The Defendant's trial began on March 16, 1999. Therefore, the delay between his arrest and the trial spanned approximately nine months.

We conclude that the delay in this case is not sufficient to trigger further analysis. Moreover, even assuming that a nine-month delay was unreasonable in this case, the Defendant has shown no prejudice resulting from the delay. "The most important inquiry with regard to prejudice is whether the delay impaired the defendant's ability to prepare a defense." State v. Patrick Thurmond, No. 01C01-9802-CR-00076, 1999 Tenn. Crim. App. LEXIS 976, at *14 (Tenn. Crim. App., Nashville, Oct. 5, 1999). The Defendant contends that he was prejudiced by the delay because it forced him to reveal "the existence of [witness] Casey Miller" to the State when he subpoenaed her to appear on the newly scheduled court date and because two rebuttal witnesses were unavailable on the newly scheduled court date. He also argues that although Miller was a "willing witness" prior to trial, she became a "hostile witness requiring a subpoena" by the time of trial. However, the Defendant has failed to present any further proof regarding the two rebuttal witnesses whom he claims would have been able to testify on the original court date, and as we will fully discuss later in this opinion, Miller's pretrial taped statement was essentially consistent with her testimony at trial. For these reasons, we are unconvinced that the Defendant was prejudiced by the delay in this case. This issue is without merit.

## II. TESTIMONY REGARDING THE VICTIM'S REPUTATION FOR VIOLENCE

The Defendant next argues that the trial court erred by barring evidence of the victim's well-known "reputation for violence and pugnacity." He asserts that the defense should have been allowed to present this evidence to corroborate the Defendant's contention that the victim was the initial aggressor.

However, the Defendant has waived this issue. First, he failed to raise the issue in his motion for new trial. Issues "upon which a new trial is sought" which are not raised in the motion for new trial are waived. Tenn. R. App. P. 3(e); see State v. Walker, 910 S.W.2d 381, 386 (Tenn. 1995). Second, it is not clear from our review of the record that the Defendant ever raised the issue at trial, as he failed to make an offer of proof regarding the evidence that he wished to introduce. The failure to make an offer of proof concerning evidence excluded at trial results in waiver of the issue. See State v. Sims, 45 S.W.3d 1, 15 (Tenn. 2001). Although the Defendant references two portions of the trial transcript in his brief to support his contention that he was precluded from discussing the victim's reputation for violence, neither of the passages that he cites affirmatively demonstrate that he attempted to introduce such evidence, and no offer of proof is included in the record with regard to this issue. We therefore conclude that this issue has been waived on appeal.

## III. EXCLUSION OF AUDIOTAPE FROM EVIDENCE

The Defendant contends that the trial court erred by excluding from evidence an audiotape recording of a pretrial statement by witness Casey Miller. He argues that the tape should have been allowed into evidence as a prior inconsistent statement because at trial, "Ms. Miller equivocated about her statement made on tape, asserting that she had only made the tape because she had been harassed into doing so" and because she "claimed her motive to make the statement was that she felt coerced by a desire to have her cousin and the defense lawyer leave her store." In his brief, the Defendant argues that "the inconsistency was her claim that her action in making the statement was not voluntary." He also maintains that Miller's "tone" during the taped statement "is quite different than the truculent, resentful tone she adopted in the courtroom."

As a general matter, we first note that the admission or exclusion of evidence is a matter within the trial court's discretion, and a trial court's decision in this regard will be overturned only if the court abused its discretion. See State v. Baker, 785 S.W.2d 132, 134 (1989). In support of his argument, the Defendant cites Tennessee Rule of Evidence 613(b), which provides as follows: "Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require." This rule allows for the "introduction of otherwise inadmissible extrinsic evidence for impeachment." State v. Martin, 964 S.W.2d 564, 567 (Tenn. 1998). "Because the prior statement is hearsay, . . . its admissibility is limited to its impeaching effect on the witness's credibility; it should not be relied upon as substantive evidence of the accused's guilt or innocence." State v. Richard Higgs, No. W2000-02588-CCA-MR3-CD, 2002 Tenn. Crim. App. LEXIS 667, at *12 (Tenn. Crim. App., Jackson, Aug. 5, 2002). The prior statement must be inconsistent with the witness' trial testimony. State v. Faron Douglas Pierce, No. E2001-00437-CCA-R3-CD, 2002 Tenn. Crim. App. LEXIS 314, at *11 (Tenn. Crim. App., Knoxville, Apr. 9, 2002). However, the Tennessee Supreme Court has stated that "a direct contradiction is not necessary for a statement to be inconsistent, and it is sufficient if the inconsistency has a reasonable tendency to discredit the witness' testimony." State v. Hall, 976 S.W.2d 121, 150 (Tenn. 1998).

In a case involving a prior inconsistent statement, "the admissibility of the extrinsic evidence is contingent upon whether the witness admits or denies having made the prior inconsistent statement." Martin, 964 S.W.2d at 567. "The unequivocal admission of a prior statement renders the extrinsic evidence both cumulative and consistent with a statement made by the witness[] during trial." Id. Therefore, when a witness unequivocally admits to having made the prior statement, extrinsic evidence of the statement is not admissible. Id.; see also State v. Gregory Dunnorm, No. E2001-00566-CCA-R3-CD, 2002 Tenn. Crim. App. LEXIS 501, at *25 (Tenn. Crim. App., Knoxville, June 12, 2002). The Tennessee Supreme Court has thus held "that extrinsic evidence remains inadmissible until the witness either denies or equivocates as to having made the prior inconsistent statement." Id. Furthermore, we note that "[e]xtrinsic evidence of prior inconsistent statements is inadmissible to impeach the statement of a witness on cross-examination as to a collateral matter." State v. Hill, 598 S.W.2d 815, 820 (Tenn. Crim. App. 1980).

Finally, we note that extrinsic evidence of a prior <u>consistent</u> statement is generally inadmissible and not subject to Rule 613(b). <u>Martin</u>, 964 S.W.2d at 567; <u>see also</u> <u>State v. Boyd</u>, 797 S.W.2d 589 (Tenn. 1990).

> [P]rior consistent statements may be admissible, as an exception to the rule against hearsay, to rehabilitate a witness when insinuations of recent fabrication have been made, or when deliberate falsehood has been implied. But before prior consistent statements become admissible, the witness' testimony must have been assailed or seriously questioned to the extent that the witness' credibility needs shoring up.

<u>State v. Benton</u>, 759 S.W.2d 427, 433-34 (Tenn. Crim. App. 1988). Prior consistent statements may also be admissible "when a witness is impeached through the introduction of a prior inconsistent statement that suggests that the witness's testimony was either fabricated or based upon faulty recollection," <u>State v. Thomas Dee Huskey</u>, No. E1999-00438-CCA-R3-CD, 2002 Tenn. Crim. App. LEXIS 550, at *515 (Tenn. Crim. App., Knoxville, June 28, 2002), or "when a witness's prior statement is used out of context to cross-examine the witness." <u>Id.</u> at *516.

Here, Casey Miller's taped statement cannot be said to have had a reasonable tendency to discredit her testimony at trial. Her prior statement is essentially consistent with her trial testimony, and we find no exception to the general rule that prior consistent statements are inadmissible that would apply in this case. In her taped statement, Miller stated that Lloyd Russell may have told her that "he had had a knife in his hand and he handed it to someone." However, she emphasized that she was not certain about this information and that she was not certain that Russell had told her this information. She stated, "Lloyd Russell and a knife connect with me. That's the best I can do." Miller also stated on tape that she was making her statement with "[a] little prompting," and she agreed that she was reluctant to talk about her knowledge of the crime. The substance of her taped statement corresponds with Miller's testimony at trial. Furthermore, even assuming that Miller's prior statement was inconsistent with her testimony at trial, the prior statement should not have been allowed to show a change in Miller's "tone," as the Defendant argues. As we have previously stated, a witness' prior inconsistent statement is not admissible to impeach the witness' statement on cross-examination as to collateral matters. <u>See</u> <u>Hill</u>, 598 S.W.2d at 820. For these reasons, we conclude that the trial court did not err by excluding from evidence the audiotaped prior statement of witness Casey Miller.

## IV. JURY INSTRUCTIONS

Finally, the Defendant argues that the trial court erred in instructing the jury. Specifically, he contends that the court should not have instructed the jury concerning first degree murder and that the jury instruction concerning second degree murder was confusing and misleading. The State argues, in part, that the Defendant has waived all issues pertaining to jury instructions for failure to cite authority in support of the arguments and for failure to make an argument regarding the second degree murder instruction. <u>See</u> Tenn. Ct. Crim. App. R. 10(b); Tenn. R. App. P. 27(a)(7).

Generally, "a defendant has a constitutional right to a correct and complete charge of the law." <u>State v. Teel</u>, 793 S.W.2d 236, 249 (Tenn. 1990). When reviewing jury instructions on appeal

to determine whether they are erroneous, this Court should "review the charge in its entirety and read it as a whole." State v. Hodges, 944 S.W.2d 346, 352 (Tenn. 1997). Our supreme court, relying on the words of the United States Supreme Court, has noted that

> "jurors do not sit in solitary isolation booths parsing instructions for subtle shades of meaning in the same way that lawyers might. Differences among them in interpretation of instructions may be thrashed out in the deliberative process, with common sense understanding of the instructions in the light of all that has taken place at the trial likely to prevail over technical hairsplitting."

Id. (quoting Boyde v. California, 494 U.S. 370, 380-81 (1990)). A jury instruction is considered "prejudicially erroneous," Hodges, 944 S.W.2d at 352, only "if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." Id.

## A.  FIRST DEGREE MURDER INSTRUCTION

The Defendant contends that the trial court should not have instructed the jury on first degree murder because "[n]o evidence was ever offered which showed premeditation." He argues that "[h]ad the trial court dismissed the first degree murder charge, the momentum of the case would have been different." Although the State argues that this issue is waived for failure to cite authority in support of the argument, see Tenn. Ct. Crim. App. R. 10(b); State v. Schaller, 975 S.W.2d 313, 318 (Tenn. Crim. App. 1997), we note that the Defendant has cited the appropriate statutory section and portions of the transcript in his brief. We will therefore address this issue.

Although the Defendant has framed this issue in terms of jury instructions, the crux of his argument is that the evidence was not legally sufficient to support a conviction for first degree premeditated murder. Generally, when an accused challenges the sufficiency of the evidence, an appellate court's standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); Jackson v. Virginia, 443 U.S. 307, 324 (1979); State v. Duncan, 698 S.W.2d 63, 67 (Tenn. 1985). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. State v. Buggs, 995 S.W.2d 102, 105 (Tenn. 1999); Liakas v. State, 286 S.W.2d 856, 859 (Tenn. 1956). Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. Liakas, 286 S.W.2d at 859. This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal

defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict.  Id.

First degree murder is defined, in relevant part, as "[a] premeditated and intentional killing of another."  Tenn. Code Ann. § 39-13-202(a)(1).  Once a homicide is established, it is presumed to be second degree murder.  State v. Nesbit, 978 S.W.2d 872, 898 (Tenn. 1998).  In order to elevate the offense to first degree murder, the state must prove premeditation.  Id.; see also State v. Brown, 836 S.W.2d 530, 543 (Tenn. 1992).

Premeditation is defined as "an act done after the exercise of reflection and judgment."  Tenn. Code Ann. § 39-13-202(d).

> "Premeditation" means that the intent to kill must have been formed prior to the act itself.  It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time.  The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Id.

Whether a defendant acted with premeditation is a question for the jury, and it may be inferred from the manner and circumstances of the killing.  State v. Holder, 15 S.W.3d 905, 914 (Tenn. Crim. App. 1999).  Thus, premeditation may be established by circumstantial evidence.  See Brown, 836 S.W.2d at 541.  The Tennessee Supreme Court has enumerated "several circumstances which may warrant the trier of fact to find or infer premeditation: the use of a deadly weapon upon an unarmed victim; the particular cruelty of a killing; any threats or declarations of intent to kill made by the defendant; the procurement of a weapon; any preparations to conceal the crime which are undertaken before the crime is committed; and calmness immediately following a killing."  State v. Keough, 18 S.W.3d 175, 181 (Tenn. 2000).  This Court has also stated that other facts which may indicate of the existence of premeditation include the shooting of the victim after he had turned to retreat or escape, the lack of provocation on the part of the victim, and the defendant's failure to render aid to the victim.  See State v. Lewis, 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000).

Sufficient evidence of premeditation was presented at trial to warrant the submission of the first degree murder charge to the jury.  Thus, a jury instruction on first degree murder was proper.  Viewing the evidence in the light most favorable to the State, the State presented evidence at trial that the Defendant was armed with a knife during the altercation with the victim, while the victim remained unarmed.  The State presented evidence that the victim sustained twelve knife wounds, as well as other minor injuries.  It also presented testimony by the medical examiner that the victim sustained a stab wound in his back, which may or may not have been inflicted when the victim was "slumped over."  In addition, the State presented evidence that the Defendant left the scene of the crime without rendering aid to the victim and that he appeared to be calm at the time of his arrest.  These and other circumstances surrounding the killing could have been used by the jury to infer

premeditation. Thus, we conclude that the trial court did not err by submitting the first degree premeditated murder charge to the jury. This issue is without merit.

## B. SECOND DEGREE MURDER CHARGE

The Defendant next argues that the jury instruction on second degree murder was "[i]mpermissibly [c]onfusing [t]hus [m]isleading the [j]ury as to the [d]ifferent [d]egrees of [c]ulpability [b]etween [s]econd [d]egree [m]urder and [o]ther [f]orms of [h]omicide." The State contends that the Defendant has failed to cite authority in support of this issue, thus waving this issue. See Tenn. Ct. Crim. App. R. 10(b); State v. Schaller, 975 S.W.2d 313, 318 (Tenn. Crim. App. 1997). However, because the jury instruction on second degree murder was incomplete in this case, and the Defendant is entitled to accurate and complete jury instructions, see Teel, 793 S.W.2d at 249, we will address this issue on appeal.

Second degree murder is defined, in relevant part, as "[a] knowing killing of another." Tenn. Code Ann. § 39-13-210(a)(1). The trial court in this case instructed the jury as follows:

> Second degree murder. Any person who commits second degree murder is guilty of a crime.
> For you to find the defendant guilty of this offense, the state must have proven beyond a reasonable doubt the existence of the following essential elements:
> (1) that the defendant unlawfully killed the alleged victim; and
> (2) that the defendant acted knowingly.
> The distinction between voluntary manslaughter and second degree murder is that voluntary manslaughter requires that the killing result from a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner. Bear in mind that if you find a knowing killing with adequate provocation, that is voluntary manslaughter.

The Defendant argues that this instruction is confusing and misleading. We disagree. In our view, this instruction is an accurate statement of the law concerning second degree murder, but it is incomplete because nowhere in the instructions was the jury given a definition of "knowingly" or "knowing." That the defendant acted knowingly is an essential element of the offense of second degree murder. See id. § 39-13-210(a)(2). The mental state of the Defendant at the time that he allegedly stabbed the victim was clearly a hotly contested issue in this case. The trial court correctly and completely instructed the jury as to the essential elements of first degree murder, including definitions of "intentional" and "premeditation." Correct and complete instructions were also provided for the offenses of criminally negligent homicide and reckless homicide. However, with regard to second degree murder and voluntary manslaughter, the latter requiring either intentional or knowing conduct, see id. § 39-13-211(a), the failure to define "knowingly" resulted in an incomplete jury charge in this case.

The jury in this case should have been instructed that "'[k]nowingly' means that a person acts with an awareness that . . . his . . . conduct is reasonably certain to cause the death of the alleged

victim." State v. Page, 81 S.W.3d 781, 788 (Tenn. Crim. App. 2002); see also T.P.I. - Crim. 7.05(a) (7th ed. 2002). Our review of the record reveals that no definition of "knowingly" was provided to the jury. In its instruction on voluntary manslaughter, the trial court stated that it had "previously defined the terms 'intentionally' and 'knowing' in [its] charges on first and second degree murder." This assertion, which was in error as to "knowing," was repeated in the trial court's instructions on reckless homicide and criminally negligent homicide. After the jury began deliberating, in response to a question by the jury, the trial court re-read to the jury the instructions on second degree murder and voluntary manslaughter, again omitting any definition of "knowingly."

Because the jury instructions on second degree murder and voluntary manslaughter did not include any definition of "knowing," which is an essential element of second degree murder and can be an essential element of voluntary manslaughter, we conclude that the jury received incomplete instructions in this case. Based upon the facts of this case, in which the Defendant's mental state was clearly at issue, we are unable to conclude that the error was harmless beyond a reasonable doubt. This Court has held that a trial court's failure to instruct on the proper applicable definition of "knowing" is prejudicial plain error. State v. Keith T. Dupree, No. 1999-01019-CCA-R3-CD, 2001 Tenn. Crim. App. LEXIS, at **14-15 (Tenn. Crim. App., Jackson, Jan. 30, 2001). In our view, it logically follows that the trial court's failure to provide any applicable definition of "knowing" was reversible error. Therefore, we REVERSE the judgment of the trial court and REMAND to the trial court for a new trial.

_____
ROBERT W. WEDEMEYER, JUDGE